# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Frederick J. Kapala | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 06 C 50124 | **DATE** | 8/3/2010 |
| **CASE TITLE** | Cooper v. City of Rockford, et al. | | |

**DOCKET ENTRY TEXT:**

Defendants' motion for summary judgment [57] is granted as to Counts I and II. Plaintiff's state law claims, Counts III-VIII, are dismissed without prejudice. This case is closed.

■[ For further details see text below.]

Docketing to mail notices.

---

## STATEMENT

Plaintiff James E. Cooper, individually and as the special administrator for the Estate of Donald H. Cooper ("Cooper"), filed an eight-count complaint against the City of Rockford ("City") and Rockford police officer Richard DeVleiger, arising from DeVleiger's fatal shooting of Cooper. In Count I, which is brought pursuant to 42 U.S.C. § 1983, plaintiff alleges that DeVleiger used excessive force when he fatally shot Cooper. In Count II, plaintiff brings a <u>Monell</u> claim against the City for its alleged custom, practice and policy to do cursory investigations into police shootings and label them as "justified." The remaining counts are state law claims seeking damages on the following bases: wrongful death (Count III); battery (Count IV); the Illinois Survival Statute, 755 ILCS 5/27-6 (Count V); punitive damages against DeVleiger (Count VI); and liability for the City based on respondeat superior (Count VII) and the Illinois Tort Immunity Act (Count VIII[1]). The case is presently before the court on defendants' motion for summary judgment. For the reasons stated below, the court grants defendants' motion on the federal claims and dismisses the state law claims without prejudice.

### I. BACKGROUND

Twenty-six year old Cooper was killed when he led DeVleiger on a short chase that ended with DeVleiger firing a fatal shot through his chest. The following facts describe the events that led to Cooper's death and are either undisputed or taken in the light most favorable to plaintiff, the non-moving party. Any disputed facts are explored in the discussion section below.

Shortly before 7:00 p.m. on February 5, 2006, DeVleiger, in uniform and driving a marked squad car, was on routine patrol when he was dispatched to the Hilander grocery store at 3710 North Main Street, Rockford, Illinois. The dispatcher informed DeVleiger that store employees had asked Cooper to leave the store, and that he was now harassing a woman in the parking lot. DeVleiger entered the Hilander parking lot and located Cooper, dressed in black jeans and a black jacket, directly in front of his squad car. Cooper immediately took off running towards North Main Street on the east side of the Hilander parking lot. DeVleiger activated his emergency lights, advised dispatch that Cooper was fleeing on foot, and gave chase in his squad car.

Cooper ran east through five lanes of traffic on North Main Street and into the parking lot across the street

between 3703 and 3721 North Main Street ("3703 parking lot"). Still chasing him, DeVleiger also crossed North Main Street, going over two curbs and the median. Cooper continued running east through the 3703 parking lot towards Robey Avenue, but abruptly stopped, changed directions, and ran back west past DeVleiger's squad car and then south along the western side of the building at 3703 North Main Street. To keep up with Cooper, DeVleiger was forced to do a "doughnut" turn, swinging his squad car from east to west, and proceeded to follow Cooper southbound along the side of the building into the grass. Once again, Cooper changed directions and ran back the way he came, directly past DeVleiger's squad car and into the 3703 parking lot. DeVleiger put his squad car in reverse and backed up two to three car lengths, ultimately coming to a stop and exiting his car at the northwest corner of the 3703 building.

Meanwhile, Eric West and his brother Douglas Moorman were taking trash out to a dumpster behind 3710 Robey Avenue, about half a block east of the 3703 parking lot. Their attention was quickly drawn to the parking lot when they noticed a man in dark clothing fleeing from a police car across North Main Street and running towards them. The brothers lost sight of Cooper for a few seconds when he ran south, because their view was obstructed by the building. However, within seconds they saw Cooper running back into the lot and coming towards them again.

After exiting his squad car, DeVleiger took one or two steps away from it. DeVleiger then commanded Cooper several times to stop running and to get down on the ground and show his hands.[2] Cooper stated "I didn't do anything" and "why you messin' with me." Cooper then turned and faced DeVleiger.[3] DeVleiger contends that Cooper said "oh, yeah" in an aggressive tone of voice. Rather than show his hands or get down on the ground as he was commanded to do, Cooper reached with his left hand and lifted his coat on his right hip while using his right hand to reach toward his right waistband area. Cooper then raised his right hand from his waistband area and extended his right arm out towards DeVleiger in a quick, fluid motion, as if he was aiming a gun. DeVleiger believed that Cooper had a gun and was preparing to shoot. Although he stated that he was in imminent fear for his life, DeVleiger did not shoot.[4] Rather, DeVleiger pointed his gun at Cooper and yelled several times for Cooper to drop his weapon and put his hands up.[5] In response, Cooper stated "fuck you" several times and turned his body to the right and away from DeVleiger, either at a 90 degree or 180 degree angle, such that his right hand was hidden from DeVleiger's line of sight. DeVleiger heard Cooper say "shoot me, shoot me" and he yelled several more times for Cooper to drop his gun and show his hands.

The brothers, still at Robey Avenue on the eastern end of the parking lot approximately half a block east of Cooper, also saw Cooper appear to pull something out of his waistband area, extend his arm toward DeVleiger, and turn away from him. Both brothers stated that Cooper then extended his arm toward them and they thought he was pointing a gun in their direction. Moorman said to his brother, "man, he's got a gun, he's got a gun, we should get out of here."

Cooper, with his right arm still extended, quickly turned to face DeVleiger again. When West saw Cooper turn, West thought Cooper was going to shoot DeVleiger and dialed 911 on his cell phone. West and Moorman took off running toward their grandfather's apartment on Robey Avenue. DeVleiger, believing that Cooper was pointing a gun and was going to shoot him, fired one fatal bullet into Cooper's chest. When Cooper fell to the ground, DeVleiger immediately ran to him, placed him in handcuffs, and began to treat his wound. The entire confrontation from when DeVleiger exited his car to when he shot Cooper took well under a minute.[6]

Officers from the Rockford Police Department arrived at the scene and investigated the shooting. It is undisputed that no weapon was ever found. Both an inquest into the death of Cooper and a Rockford Police Department investigation concluded that Cooper's death was justifiable homicide.

## II. DISCUSSION

Summary judgment is warranted when the evidence, when viewed in a light most favorable to the non-moving party, presents "no genuine issue as to any material fact" such that "the moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A scintilla of evidence in support of the non-movant's case is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In applying this standard, all disputed issues of fact are to be resolved in favor of the non-moving party. Id. at 255.

Defendants argue that plaintiff's excessive force, battery, and wrongful death claims (Counts I, III, and IV) must be dismissed because DeVleiger reasonably believed that he was threatened with a weapon and therefore his use of deadly force was justified.[7] If plaintiff's wrongful death claim fails as a matter of law, defendants argue that the survival claim (Count VII) must also fail. Finally, defendants argue that the Monell claim (Count II) must be dismissed because there is no underlying constitutional violation and, even if there was, plaintiff has put forth no evidence to support a policy or custom.

## A. Excessive Force Claim

Plaintiff argues that defendant violated the decedent's Fourth Amendment right to be free from unreasonable seizures when he fatally shot Cooper. In defense, DeVleiger contends that he is entitled to qualified immunity. See Pearson v. Callahan, 555 U.S. __, 129 S. Ct. 808, 815 (2009) (noting that qualified immunity is a defense not just against liability, but against suit itself, and should be resolved as early in the litigation process as possible). Qualified immunity shields a police officer from liability for civil damages if "a reasonable officer, facing the same situation, could have believed that deadly force was necessary to protect himself or others from death or serious physical harm." Ellis v. Wynalda, 999 F.2d 243, 246 (7th Cir. 1993). Qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Hunter v. Bryant, 502 U.S. 224, 229 (1986) (quotation marks omitted); see also Pearson, 129 S. Ct. at 815 ("The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.' (Quotation marks omitted)).

To defeat a defense of qualified immunity, plaintiff must establish that the facts, when taken in the light most favorable to him, show that DeVleiger violated a constitutional right, and that the right was clearly established at the time of the violation. See Scott v. Harris, 550 U.S. 372, 377 (2007).

## 1. Constitutional Right

Citizens have a constitutional right to be free from the use of excessive force during an arrest, investigatory stop, or other seizure of their person. Graham v. Connor, 490 U.S. 386, 395 (1989). "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Tennessee v. Garner, 471 U.S. 1, 7 (1985). When an officer uses deadly force, the constitutionality of his actions is reviewed in light of the Supreme Court's doctrine that such force is reasonable if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." Id. at 11. "If the suspect threatens the officer with a weapon that risk has been established." See Bell v. Irwin, 321 F.3d 637, 639 (7th Cir. 2003) (quotation marks omitted).

Whether the officer was ultimately correct that a suspect threatened him with a weapon is irrelevant so long as the officer "reasonably believed" it was so. Sherrod v. Berry, 856 F.2d 802, 807 (7th Cir. 1988); see also Graham, 490 U.S. at 396-97 (holding that the court, mindful that officers are often forced to make split-second decisions in "tense, uncertain and rapidly evolving" situations, must not review their decisions with hindsight vision; rather, the court must judge their actions "from the perspective of a reasonable officer on the scene" and "in light of the facts and circumstances confronting them."). Accordingly, the relevant question before the court is whether a reasonable officer in DeVleiger's position could have believed that Cooper threatened him with a weapon.

## 2. Fact Disputes

Plaintiff argues that there are several factual disputes that make summary judgment inappropriate. At the summary judgment stage, it is the plaintiff's burden to put forth the evidence it would use to convince the jury to accept its version of the facts. Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Scott, 550 U.S. at 380 (alterations and quotation marks omitted).

On plaintiff's excessive force claim, a genuine issue of material fact is created only if plaintiff can put forth more than a scintilla of evidence that no reasonable officer in DeVleiger's position could have believed that Cooper threatened him with a weapon. See Walter v. Fiorenzo, 840 F.2d 427, 434 (7th Cir. 1988) (a fact dispute is not material to the case, and thus does not preclude the entry of summary judgment, unless it "might affect the outcome of the suit under governing law").

A plaintiff cannot create a genuine issue of material fact with speculative theories that are not supported by scientific evidence or witness testimony. See Tom v. Voida, 963 F.2d 952, 961 (7th Cir. 1992) (plaintiff's suggestion that decedent's arms were outstretched in surrender, not in attack, was speculation where there was no witness to testify that his movements indicated surrender and there was no scientific evidence that he was retreating to contradict defendant's testimony); Chappell v. City of Cleveland, 585 F.3d 901, 911 (6th Cir. 2009) (plaintiff is not entitled to the "benefit of inferences and suppositions that are not only not supported by the record facts, but are directly contradicted by the record facts"). Nor can a plaintiff simply attack the defendant's testimony without offering its own evidence to suggest that a defendant acted unreasonably. See Voida, 963 F.2d at 961 (merely pointing out "minor ambiguities" or discrepancies in defendant's testimony "do[es] not relieve the plaintiff of the burden of presenting affirmative evidence to support her case").

### a. Cooper's Movements

DeVleiger maintains that Cooper's movements, occurring over the course of approximately fifteen to twenty seconds from the time DeVleiger exited his car to the moment that he fired his gun, made him believe that Cooper had a weapon and was going to shoot. Plaintiff puts forth several interpretations of Cooper's movements that it argues casts doubt on whether a reasonable officer in DeVleiger's position could have believed that he was in imminent danger.

First, plaintiff argues that when Cooper ignored DeVleiger's command to get down and put his hands up and instead reached his right hand to his waistband area, Cooper could have been pulling up his pants. Plaintiff cites one witness who stated that Cooper was wearing baggy jeans, and a second witness who stated that when she saw Cooper in the Hilander grocery store before the chase began, he was "trying to hold his pants up with one hand and his belt was dragging on the floor." Similarly, plaintiff argues that rather than pretending to wield a gun and point it at DeVleiger and the witnesses, Cooper was pointing his middle finger at DeVleiger "in a universal gesture of defiance" while he yelled "fuck you," and merely "pointed" toward the witnesses.

Plaintiff's theories are pure speculation. That Cooper had baggy jeans on and previously had trouble holding them up says nothing about whether he was actually pulling them up when he confronted DeVleiger in the 3703 parking lot, or whether that was the only reasonable interpretation of his actions. Furthermore, the theories are at odds with the testimony of the witnesses who actually saw Cooper at the time in question. The two brothers and DeVleiger all described Cooper's movements as that of someone who was pulling out something from the waist or front pocket area and then pointing that object at the witnesses as if preparing to shoot. In fact, all three witnesses believed that Cooper had a gun. In sum, that Cooper might have been pulling up his pants does not in any way suggest that DeVleiger's belief that he was actually going into his waist area for a gun was unreasonable.

Plaintiff also argues that there is a material dispute over whether Cooper was facing DeVleiger when DeVleiger fired his weapon. If he was not facing DeVleiger, then plaintiff contends that DeVleiger could not have reasonably believed that his life was in danger. To support this theory, plaintiff refers to the coroner's report stating that the bullet entered Cooper's left chest and came to rest below the skin behind the right lung. Based on this evidence, plaintiff concludes, in his lay opinion, that Cooper was turning towards DeVleiger but could not have been directly facing him when he was shot.

Again, plaintiff's argument requires speculation. Plaintiff has not provided a witness who could testify to the medical conclusions that should be drawn from the autopsy report, and without some further evidence, the fact finder is left only to speculate about how a bullet travels through a body and what that trajectory might say about how Cooper was shot. See Reed v. Town of N. Judson, Ind., 996 F.2d 1219, *4-5 (7th Cir. 1993) (holding that counsel's argument that a certain inference should be drawn from the fact that an autopsy report shows the bullet traveled downward does not raise a genuine issue of material fact regarding the position decedent must have been in when shot).

Even if plaintiff had provided more evidence, just how far Cooper had to turn to his left[8] or just how square he was when he was shot, is immaterial. The fact remains that plaintiff has not provided any affirmative evidence to materially dispute the testimony of DeVleiger or the witnesses that Cooper at least began to turn and face DeVleiger, had his arm extended towards him in a shooting position, and refused to comply with DeVleiger's instructions to get down and put his hands up. If up until that point, DeVleiger reasonably believed that Cooper was holding a gun and could shoot him, that DeVleiger may have fired his gun a few milliseconds before Cooper's body was fully facing him is of little import. The law does not require that a police officer wait until a gun is pointed directly at him to defend himself.

b. Distance

Plaintiff also argues that there is a genuine issue of material fact with respect to how far away Cooper was from DeVleiger when DeVleiger fired his weapon. While Moorman estimates the distance at 15 to 20 feet, and DeVleiger at 15 to 25 feet, plaintiff argues that the distance should be considered as close as 3 to 10 feet, an estimate that it contends West gave in his deposition.[9] After careful review of West's deposition and plaintiff's evidence, the court finds that West's testimony does not create a genuine, material dispute.

Although West first answered that the distance could be three feet, he almost immediately corrected himself. Plaintiff's counsel then asked a series of questions to clarify his testimony and he responded that the distance was "[l]ike ten feet." Accordingly, when taken in the light most favorable to plaintiff, the reasonable inference to be drawn from this evidence is that DeVleiger and Cooper were about ten feet apart. Plaintiff has not provided more than a scintilla of evidence to support an inference that the distance was significantly less than ten feet, and a slight deviation would not materially affect the reasonableness of DeVleiger's use of force when considering the evidence of Cooper's movements and the short time in which the interaction occurred.

Plaintiff also argues that DeVleiger provided inconsistent testimony regarding how close he came to Cooper upon exiting his squad car, and suggests DeVleiger could have been closer to Cooper when he fired his gun. DeVleiger contends that he took one, maybe two steps away from the car before stopping, but an investigation report written by Sergeant Steve Perry after the incident states that DeVleiger "chased" Cooper before Cooper turned around. However, this is not a genuine, material dispute on this issue. Plaintiff submitted a document of additional Rule 56.1(b)(3) facts wherein it stated that "DeVleiger got out of his car, did not chase Mr. Cooper, and took maybe one step away from the car." DeVleiger, in his response, admitted this fact. Accordingly, it is not in dispute. Moreover, as stated above, a slight deviation in the distance would not materially affect the reasonableness of DeVleiger's actions.

## c. Light

When DeVleiger encountered Cooper it was dark outside, and the only light on the suspect was artificial. It is unclear, however, just how much artificial light was present and where the light was located. In cases where a defendant mistakenly believed that the suspect had a weapon, a plaintiff meets his burden of production not where he merely attacks the defendant's credibility, but where he provides affirmative evidence that another witness believed or saw otherwise. See, e.g., White v. Gerardot, 509 F.3d 829, 832 (7th Cir. 2007) (finding a genuine issue of material fact concerning whether suspect pointed a gun at the officers where witness testified that she saw him and he did not have a handgun); Coleman v. Wiencek, No. 08 C 5275, 2010 WL 1506708, *5 (N.D. Ill. Apr. 13, 2010) (same); Nicarry v. Cannaday, 260 F. App'x 166, 170 (11th Cir. 2007) (fact that it was dark out does not create a genuine issue of material fact as to whether defendant could see a screwdriver in plaintiff's hand where defendant testified that he actually saw it and that plaintiff was actually illuminated by a flashlight, and where there was no witness to say that they did not see the screwdriver) (emphasis added).

Plaintiff argues that the evidence, when viewed in its favor, establishes that the parking lot was well lit, the spotlight and headlights on DeVleiger's car were on, and that witnesses were able to see that Cooper did not have a weapon. A detailed review of the evidence before the court is necessary here. Only two witnesses, Moorman and West, viewed the entire interaction and were extensively examined as to the lighting in the area. In his deposition, Moorman stated that it was "really dark" out, and the parking lot lights were not all on. When asked if there was lighting in the area that DeVleiger and Cooper were in, better lighting than where Moorman was standing, Moorman answered, "Oh, no. The - the other lighting was by the building and he was a little bit a ways away from the building," about fifteen feet away from it. Although West generally described the parking lot as "good in spots" and later as "evenly lit" when asked if there were shadows, he then explained that the closest light came from street lights near Robey Avenue and North Main Street.

All three witnesses - DeVleiger, West, and Moorman - testified that DeVleiger's headlights were on. Unlike Moorman and DeVleiger, West testified that the manipulable spotlight on DeVleiger's car also was on.[10] Both West and Moorman stated that the squad car was generally facing in the direction that Cooper had been running in the parking lot, but the police department investigation found that the car was facing the southeast. Although West stated that he saw the spotlight, he did not say whether it had been manually turned outward to face Cooper (the only way it could have been effective), and whether it illuminated him so as to see the contents of his hands. Plaintiff also offers the testimony of Officer Eriche Rhode, the second officer to respond to the scene after Cooper was shot. When Rhode arrived, Cooper was on the ground and DeVleiger was tending to his wound. He noticed that there was light on Cooper's body, but was unsure of the source. He also generally explained that DeVleiger's spotlight - depending on whether it was manually turned towards the desired direction and how far away a suspect is from the vehicle - could be used to help view or blind a suspect and "would be in perfect line to illuminate whatever he needed to see." He did not know, however, whether the spotlight was on at the time of the confrontation, whether it was manually turned to face Cooper, or how far away Cooper was, so he could not say whether it would have been effective if used in DeVleiger's circumstances.

Plaintiff argues that West and Moorman's testimony showed that the lighting was good enough for them to see Cooper's hands and know they were empty. This assertion is not supported by the evidence. Moorman explained that he could see Cooper's clothes were dark, but could not tell what color they were because "it was really dark"; he could see that Cooper was reaching toward his waist, but "it was dark" and all he saw was "reaching down, then he pointed something at me that looked like a gun." When West was challenged by plaintiff's counsel to explain how he could think Cooper had a gun but not actually see one, West explained "it's black out and they're holding their hand out like this, (indicating like he has a pistol), something like - they're acting like they have something or they do have something." West was so convinced that Cooper was going to shoot DeVlieger that he called 911. It is clear, then, from West and Moorman's testimony, that they both could generally see Cooper, but that they were hampered by the darkness. Whatever light existed, at least from their

view, did not sufficiently illuminate Cooper's hands or surely they would not have feared gun fire.

In sum, plaintiff provided evidence upon which a jury could find the following facts: there was at least one light on in the parking lot, about fifteen feet away from Cooper; there was some other light provided by street lamps on North Main Street and Robey Avenue; DeVleiger's headlights and spotlight were on, and the car was generally facing the direction Cooper was running. While plaintiff's evidence describes the lighting conditions in the general area, plaintiff has not provided any witness or scientific evidence in its favor that could establish how illuminated Cooper's hands appeared to a person standing approximately ten feet west of him.[11] Accordingly, one cannot conclude that the lights were bright enough and close enough to Cooper so as to sufficiently illuminate his hands against an otherwise dark parking lot and black clothing to someone in DeVleiger's position without engaging in speculation. That kind of speculation would not only be improper, but it would be at odds with the on-scene perceptions of the only witnesses who actually attempted to view Cooper's hands under the lighting conditions present, and clearly believed that Cooper was armed and going to shoot.

Because the court finds that plaintiff has not established a genuine issue of any material fact, the court now turns to the reasonableness of DeVleiger's use of deadly force. See Bell, 321 F.3d at 640 (concluding that, when material fact disputes are resolved, the reasonableness of force is a legal issue for the court to decide; a jury would have nothing left to do but second guess the officers, which is impermissible).

## 3. Legal Question

A suspect has the right to be free from deadly force employed without justifiable belief that the suspect poses an immediate threat of danger. Garner, 471 U.S. at 11. But this right does not entitle a suspect to act recklessly with impunity. See Sherrod, 856 F.2d at 805 ("[N]o right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts." (Quotation marks omitted)). There is no denying the fact that DeVleiger made a factual mistake in believing that Cooper was armed, the consequences of which were tragic. The actions he took in reliance on his mistaken belief, however, were not unconstitutional.

The record before the court establishes that an unarmed Cooper, dressed in all black, led DeVleiger on an erratic nighttime chase after being reported for committing a non-violent crime. When Cooper finally stopped running, he was agitated and swearing, and refused DeVleiger's commands to get down on the ground or put his hands in the air in surrender. While standing about ten feet away from DeVleiger, Cooper put his right hand down to his waist area and brought it up as if he was pointing a gun at DeVleiger. Cooper then turned away from DeVleiger, holding his right hand out towards two witnesses and momentarily obstructing DeVleiger's view. When Cooper brought his arm back around and faced DeVleiger, DeVleiger, fearing for his life, fired a single, fatal bullet.

It is impossible to understand why Cooper pretended to threaten DeVleiger with a gun. It is also entirely impermissible to expect an officer to correctly interpret Cooper's undisclosed state of mind within seconds and under a great deal of stress. Although he could not see if Cooper had anything in his hands, DeVleiger believed that Cooper was aiming a gun at him, as did two civilian witnesses, and the court finds that DeVleiger's belief was reasonable.

Plaintiff makes several arguments challenging the reasonableness of DeVleiger's use of deadly force. As an initial matter, plaintiff argues that DeVleiger should have used alternative, non-lethal measures such as using his door for cover, the spotlight to blind Cooper, or a disabling chemical spray. Putting aside the fact that plaintiff has no evidence that DeVleiger had time for such measures, or was even carrying spray, the law is clear that officers are not required to use "[t]he least or even a less deadly alternative so long as the use of deadly force is reasonable." Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994). Because the use of deadly force was reasonable, the court may not question whether DeVleiger could have used other tactics.

Plaintiff also argues that, while it might have been reasonable for DeVleiger to shoot Cooper when he first reached to his waistband, DeVleiger lost his right to justifiably use deadly force because he did not shoot when Cooper reached into his waistband, when he first extended his arm at DeVleiger, or when he extended his arm at the witnesses.[12]  To support this argument, plaintiff relies on Ellis v. Wyanalda, which held that, "[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity."  999 F.2d 243, 247 (7th Cir. 1993).  In that case, the plaintiff provided evidence that, if believed, established that the suspect was unarmed and running away from the officer when he was shot, and thus the officer had "no reasonable fear" that his life or that of another was in danger.  Id.

It is clear that an officer may not shoot after the danger has come and passed.  However, unlike in Ellis, Cooper was not running away when he was shot.  Nor is there evidence that DeVleiger no longer reasonably believed that Cooper was armed.  The law does not require that an officer use deadly force whenever he feels threatened; it simply mandates that when he chooses to do so, it is in response to an apparent, immediate threat.  Because the court finds that DeVleiger was reasonable in his belief that Cooper threatened him with a weapon, it makes no legal difference that DeVleiger waited until the third time he felt his life was in danger before pulling the trigger.[13]

Finally, plaintiff argues that DeVleiger's behavior was unreasonable because he may have used profanity while ordering Cooper to drop the weapon and get on the ground, did not try to calm Cooper down, and fired his weapon even though he could not see a gun and should have realized that Cooper was probably drunk.  This conduct does not make DeVleiger's actions unreasonable, and plaintiff has not pointed to any case law that would make it so.[14]  If anything, it was Cooper's language and erratic behavior that precipitated DeVleiger's need to yell orders quickly and fire his weapon even though under difficult lighting circumstances.

Accordingly, as a matter of law, the court finds that DeVleiger did not violate a constitutional right because he reasonably believed that Cooper threatened him with a weapon.  The court need not address the remaining element of qualified immunity.  DeVleiger is entitled to summary judgment on Count I.

## B. Monell Claim

Plaintiff's Monell claim, Count II, must fail because there is no underlying constitutional violation.  See Proffitt v. Ridgway, 279 F.3d 503, 507 (7th Cir. 2002) citing City of L.A. v. Heller, 475 U.S. 796, 799 (1986).  Even if plaintiff had established a constitutional violation, however, its Monell claim would not survive this motion for summary judgment.  Plaintiff must show either an express policy that causes a constitutional deprivation or that the City had a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." Montano v. City of Chi., 535 F.3d 558, 570 (7th Cir. 2008) (quotation marks omitted).  There is no evidence that the City had an express policy to perform cursory investigations and rubber stamp shootings as justified.  Plaintiff has also failed to show any evidence of a widespread practice of the same.  Plaintiff's evidence of is limited to Cooper's arrest, which cannot establish a widespread practice.  See Calhoun v. Ramsey, 408 F.3d 375, 380 (7th Cir. 2005) (holding that plaintiff must put forth "more evidence than a single incident to establish liability").  Accordingly, the City is entitled to summary judgment on Count II.

## C. State Law Claims

Having concluded that defendant DeVleiger and defendant City are entitled to summary judgment on plaintiff's pending federal claims, the court declines to exercise supplemental jurisdiction over the remaining state law claims.  See 28 U.S.C. § 1367(c)(3); Wright v. Associated Ins. Cos. Inc., 29 F.3d 1244, 1251 (7th Cir. 1994) ("[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendant state-law claims rather than resolving them on the merits.").  Accordingly, the claims raised in Counts III, IV, V, VI, VII, and VIII of plaintiff's complaint are dismissed without prejudice.

### III. CONCLUSION

For the foregoing reasons, the court grants defendants' motion for summary judgment as to Counts I and II, and dismisses Counts III - VIII without prejudice.

1. Plaintiff improperly numbered the Illinois Tort Immunity Act claim as "Count VII" in its complaint. For purposes of this opinion, the court will refer to this claim as plaintiff's "Count VIII."

2. Plaintiff objects to the statements between Cooper and DeVleiger leading up to Cooper's death as hearsay and/or barred by the Dead Man's Act, 735 ILCS 5/8-201. To the extent statements are used in this opinion, the court has determined that they are not hearsay or that they would fall under a hearsay exception. Furthermore, the Dead Man's Act, if it would apply at all, would only apply to the state law claims, which the court declines to resolve on the merits. See Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1051 (7th Cir. 1977).

3. Plaintiff states in its Response to Local Rule 56.1(a)(3) Statement that this fact is disputed because Brianne Shaw, a witness in the Hilander parking lot, only saw Cooper running away from DeVleiger before he was shot. This is not a genuine dispute. The autopsy report is clear that the bullet entered Cooper from the front chest area and never exited his body. See Scott v. Harris, 550 U.S. 372, 378, 380 (2007) (noting that the court is entitled to rely on a videotape that "quite clearly contradicts the version of the story told by respondent"). Even plaintiff appears to notice the implausibility of Shaw's testimony as evidenced by the fact that it admitted several factual statements concerning Cooper turning toward or facing DeVleiger, and later argued that he was turning to face DeVleiger when he was shot.

4. DeVleiger does not remember when he removed his gun from its holster, but believes he did so after seeing Cooper reach to his waistband. Plaintiff cites testimonial evidence that DeVleiger had his gun out when he exited his squad car. This is not a material fact dispute, however. Plaintiff does not argue that it would have been unreasonable for DeVleiger to display his gun when he exited his squad car, as it likely would not have been. Nor does plaintiff argue that the unreasonableness of taking out his gun when he exited his car somehow affected the reasonableness of his later use of deadly force, as it likely would not have. See Carter v. Buscher, 973 F.2d 1328, 1332 (rejecting the idea that the Fourth Amendment prohibits a police officer from creating a dangerous situation in which to arrest a suspect). Accordingly, this fact is not materially disputed and the court accepts, for purposes of this opinion, that DeVleiger removed his weapon from the holster either at the time, or some point immediately prior to, the time that Cooper extended his arm towards DeVleiger.

5. Plaintiff argues that there is a dispute as to whether any words were exchanged between Cooper and DeVleiger at all, and relies on Brianne Shaw's testimony that she did not hear anything spoken between them. Shaw's testimony does not create a disputed issue because she was in a car in the Hilander parking lot across five lands of traffic and therefore clearly not in a position to hear whether a conversation was occurring. Moreover, testimony that one did not hear anything spoken does not contradict testimony that words were actually exchanged.

6. DeVleiger stated that from the time he exited his car to the time that he fired his weapon, about fifteen seconds passed. Another witness stated that she watched the entire interaction - from Cooper running across North Main Street to DeVleiger firing his weapon - in one cycle of lights while in

a car at the intersection of North Main Street and Riverside. The same witness stated that at least twenty seconds probably went by from the time DeVleiger exited his car to the time he shot Cooper.

7. The court notes that defendants exceeded the maximum allowance for statements of fact in their Local Rule 56(a)(3) statement. The court directs defendants to adhere to the Local Rules in all future motions before the court.

8. Plaintiff argues that Cooper must have made a 270 degree turn to face DeVleiger. This argument is not supported by the evidence. Cooper was facing DeVleiger when he appeared to be taking something out of his pocket or waist band area. Cooper then turned to his right and extended his arm towards the witnesses across the parking lot. It is unclear whether Cooper turned a full 180 degrees and had his back turned toward DeVleiger, or whether he turned 90 degrees, and had his side to DeVleiger. What is undisputed, however, is that Cooper's right arm, extended in what the two brothers believed to be a shooting position, was to the east, and therefore obstructed from DeVleiger's view by Cooper's torso. Based on the evidence, Cooper must have turned between 90 and 180 degrees to his left when he extended his arm back toward DeVleiger.

9. Plaintiff also submitted photographs that it argues establishes that DeVleiger and Cooper were "no more than a car length or 10-12 feet" from each other when Cooper was shot. However, plaintiff misstates the significance of marker #1. The legend that was made with the original diagram makes clear that marker #1 represents the location of the shell casing that was found, not the location where DeVleiger stood, as plaintiff contends. Because plaintiff offers no evidence regarding where DeVleiger could have been standing based on the location of the shell casing that ejected from his gun, the court cannot consider these photographs evidence of DeVleiger's position.

10. Plaintiff asks the court to take judicial notice of the fact that the spotlight would have enabled DeVleiger to see Cooper's hands. The court has not been presented with sufficient evidence with which to do so.

11. Plaintiff also submitted photographs of the scene that it argues establishes the lighting in DeVleiger's direct line of sight, and generally establishes the parking lot's lighting. The court finds these photographs unpersuasive. Initially, the court notes that the photographs depict a dark area, and the court doubts that they support anything other than the fact that it would be very difficult to see a black gun against black clothing. Moreover, the pictures are inaccurate to the extent that they purport to show DeVleiger's line of sight for the same reason as stated in endnote 9 above, and to the extent that they show sources of light that were not present at the time of the confrontation (i.e., headlights from other police cars directly shining on the blood pool).

12. It is worth noting, however, that the only evidence before the court is that DeVleiger did not see Moorman and West until after he shot Cooper, and therefore he had no reason to believe that Cooper was threatening another's life.

13. Plaintiff argues that DeVleiger's testimony suggests that he was scared for his life on three occasions: first, when Cooper reached down towards his waistband area; second when Cooper lifted his hand from his waistband area and extended his arm toward DeVleiger; and third when Cooper turned toward DeVleiger and extended his arm at him again.

14. The court also does not find the fact that DeVleiger may have violated The Law Enforcement Handbook provided by plaintiff to be persuasive. Plaintiff has not established why DeVleiger

should be bound by this handbook.  In any event, it is not clear that evidence regarding the good practice of trying to calm down a suspect is even relevant, as it appears to be pre-seizure conduct. <u>See, e.g.</u>, <u>Carter v. Buscher</u>, 973 F.2d 1328, 1332 (7th Cir. 1992) (stating that pre-seizure conduct is not subject to Fourth Amendment scrutiny).